## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

SUZANNE SARNI,

      Plaintiff

      V.

MARSH & MCLENNAN COMPANIES,
INC., PUTNAM INVESTMENTS, INC.,
HARTFORD LIFE AND ACCIDENT
INSURANCE COMPANY, MARSH &
MCLENNAN COMPANIES INC. LONG-
TERM DISABILITY PLAN

      Defendants

CIVIL ACTION NO.

## <u>COMPLAINT</u>

### INTRODUCTION

1.    Plaintiff, Suzanne Sarni ("Ms. Sarni"), brings this action against the Defendants,

Marsh & McLennan Companies, Inc. ("MMC"), Putnam Investments, Inc.

("Putnam"), Hartford Life and Accident Insurance Company ("the Hartford"), and

Marsh & McLennan Long-Term Disability Plan ("Plan") (collectively referred to as

"Defendants") for violation of the Employment Retirement Income Security Act of

1974, as amended, 29 U.S.C. §§ 1001 *et. seq*. ("ERISA").  Ms. Sarni is a participant

in three ERISA welfare benefit plans.  Policies A083082035 and A083082036 are

underwritten by the Hartford and insured by MMC.  Policy GLT-204034 is

underwritten and insured by the Hartford.

2.    Ms. Sarni is filing this action to: 1) recover long-term disability ("LTD") benefits

due under the Plan; 2) recover her employee benefits, including without limitation,

health insurance coverage as a result of her eligibility for LTD benefits; 3) enforce the present rights existing therein; 4) clarify rights under the terms of the Plans; and 5) recover interest, costs and attorneys' fees as provided by ERISA.

3.      Ms. Sarni challenges the Defendants' 1) unreasonable and unlawful denial of her disability benefits despite the substantial medical evidence demonstrating her qualifications for said benefits; 2) pattern of rejecting and/or ignoring the substantial evidence supporting Ms. Sarni's total disability due to Multiple Sclerosis; 3) failure to provide Ms. Sarni with a full and fair review of her claim; and 4) failure to provide a reasonable claims procedure that would yield a decision on the merits of Ms. Sarni's claim.

## JURISDICTION

4.      This Court has personal and subject matter jurisdiction over this case under 29 U.S.C. § 1132(e) and (f), without regard to jurisdictional amount or diversity of citizenship, in that the defendant's breach of its ERISA obligations took place in this district.

## PARTIES

5.      Ms. Sarni is a resident of Massachusetts.  Ms. Sarni is a vested participant in the three employee benefit plans in this matter, Policies GLT-204034, A083082035, and A083082036 within the meaning of 29 U.S.C. § 1002(2) (7).  Ms. Sarni has standing to bring this action under 29 U.S.C. § 1132(a).

6.      The defendant, MMC, is a for-profit with its principal place of business at 1166 Avenue of the Americas, New York, New York.  MMC is a global professional services firm.  MMC is the parent company of the defendant, Putnam Investments, Inc. ("Putnam").  MMC insures Polices A083082035, and A083082036.

7.      The defendant, Putnam, is a large investment management company.  Putnam was Ms. Sarni's employer when she became disabled.  Putnam's principal place of business is 1 Post Office Square, Boston, Massachusetts.

8.      The defendant, the Hartford, is a for-profit corporation with its principal place of business at 200 Hopmeadow Street, Simsbury, Connecticut.   The Hartford transacts business in Massachusetts and insures and underwrites the policies under which Ms. Sarni is suing.  The Hartford is the party responsible for processing claims made under the Plan and making a final determination as to a Plan participants' eligibility for LTD benefits.  At the time Ms. Sarni's LTD benefits were terminated, the Hartford administered Policies GLT-204034, A083082035, and A083082036.  Also, at the time Ms. Sarni's LTD benefits were terminated, the Hartford insured Policy GLT-204034.

9.      At all times relevant to the claims asserted in this Complaint, MMC, Putnam, and the Hartford purported to act as an ERISA claims fiduciaries with respect to participants of the LTD plans, generally, and specifically, with respect to Ms. Sarni, within the meaning of ERISA.

10.      The Plans under which Ms. Sarni is suing are "group life insurance plan[s]" issued and maintained by the Hartford.

## STATEMENT OF FACTS

### Insurance Entitlement, Discretion, Plan Definitions

11.      Ms. Sarni was hired by Putnam in September 2000 as an Employee Development Training Manager.

12.     At the time of Ms. Sarni's hire and the onset of her disability, Putnam's disability

insurance carrier was CNA Group Life Assurance Company.  In 2003, the Hartford

acquired CNA Group Life Assurance Company.

13.     Ms. Sarni became insured under Policies A083082035 and A083082036 on

December 21, 2000, and Policy GLT-204034 on July 1, 2001.

14.     Policies A083082035 and A083082036  define disability as follows:

During the first 30 months of an approved disability, you are considered
totally disabled if you are unable to continuously perform the substantial
and material duties of your present occupation because of an illness or
injury, as long as you are not engaged in any other occupation or
employment.  Medical certification of disability is required, and you
must be under the regular care of a licensed physician who is qualified to
treat your condition.  You are responsible for any costs you may incur to
initially qualify for disability, such as providing medical records or
submitting to an independent examination.

The plan's definition of total disability changes after 30 continuous
months of disability payments.  After 30 months, you are considered
totally disabled and eligible for benefits if you are continuously unable to
engage in duties of any substantial gainful employment for which you
are reasonably qualified by education, training or experience.  You must
be under the regular care of a licensed physician who is qualified to treat
your condition.

15.     Policy A083082035 provides a basic benefit of 40% of Ms. Sarni's monthly salary

she was receiving at the time of loss or a gross monthly indemnity of $1,824.67.

16.     Policy A083082036 is an Optional Plan that provides a benefit of 30% of Ms. Sarni's

monthly salary she was receiving at the time of loss or a gross monthly indemnity of

$1,368.50.

17.     Policy GLT-204034 defines Disability as follows:

Under the Plan, you are considered disabled and eligible for benefits under
the LTD Plan if you are continuously unable to engage in duties of any
substantial gainful employment for which you are reasonably qualified by
education, training or experience.  However, during the first 30 months of

4

disability (This includes the six month Elimination Period plus 24 months disabled.), you are considered totally disabled if you cannot perform the duties of your present – rather than any – occupation, as long as you do not engage in any other occupation or employment.

18.  Policy GLT-204034 is a Bonus Plan that provides a monthly benefit of $212.50 per month.

**Ms. Sarni's Disability**

19.  In 1991, Ms. Sarni was diagnosed with Relapsing Remitting Multiple Sclerosis after she experienced numbness and tingling in her lower extremities and blurred and double vision.  This diagnosis was confirmed by MRI diagnostic testing.

20.  Relapsing Remitting Multiple Sclerosis is characterized by clearly defined flare-ups of acute worsening neurologic function.

21.  Multiple Sclerosis is a chronic disease; there is currently no cure.  Multiple Sclerosis is also a progressive illness.

22.  According to her treating physicians, Ms. Sarni's most severe symptoms are fatigue and cognitive dysfunction.  Also, Ms. Sarni requires a Canadian crutch to assist her in her gait and balance.

23.  Studies have shown that between 75 and 95% of all Multiple Sclerosis patients suffer from severe fatigue and between 50 and 60% of those individuals identify fatigue as one of their worst symptoms.   Multiple Sclerosis fatigue is characterized by the lack of physical and mental energy.  Individuals with multiple sclerosis fatigue have a unique type of fatigue referred to as lassitude.

24.  Multiple Sclerosis fatigue is characterized by fatigue that generally occurs on a daily basis, occurs early in the morning, even after a restful night's sleep, worsens as the

day progresses, is aggravated by heat and humidity, comes on easily and suddenly, is more severe than normal fatigue, and interferes with daily responsibilities.

25.    Studies have shown that between 40 and 65% of patients with Multiple Sclerosis experience cognitive dysfunction particularly with regard to memory, processing speed, and sustained attention.

26.    To treat her symptoms, Ms. Sarni currently takes Levoxyl 137 mcg once daily, Clonazepam .5 mg twice daily, Bupropion 200 mg twice daily, and Provigal 200 mg once daily.

27.    Ms. Sarni has also undergone counseling, physical therapy, aquatic therapy, and massage therapy, and has met with a nutritionist, in an attempt to lessen her continued symptoms of Multiple Sclerosis.

**Ms. Sarni's Inability to Work in her Own or an Accommodated, Sedentary Position**

28.    From September 2000 through July 2001, Ms. Sarni worked as an Employee Development Manager at Putnam.  Her duties in this role included teaching classes, printing and assembling workbooks for training sessions, transporting training materials to training sessions, setting up and breaking down training sessions, and traveling.

29.    Ms. Sarni's position as Employee Development Manager was physically and mentally demanding.  Since Ms. Sarni suffered from Multiple Sclerosis, her body could not cope with the demands of her position.  She began to experience increased fatigue and cognitive dysfunction.  She also fell down on several occasions due to imbalance and gait difficulties.

30.    Ms. Sarni testified in her February 27, 2008 affidavit:

> When I joined Putnam, it was a new adventure and I loved what I was
> doing, which was training.  Despite my feelings towards my job, my
> condition soon caused me to dread the thought of making it through an
> entire work day.  I wanted to be capable to do everything and do a good
> job, but my body wasn't cooperating.  I soon felt inadequate and I'm
> sure that added to my stress.

31.    In and around July 2001, Putnam changed Ms. Sarni's position to Senior

Development Specialist due to her inability to perform her job as Employee

Development Manager as a result of her Multiple Sclerosis.

32.    As Senior Development Specialist, Ms. Sarni was able to work from home.  Ms. Sarni

was assigned to individual projects.  She was responsible for converting Putnam's

stand-up classroom training to an e-learning format.  Ms. Sarni remained involved in

monthly meetings, scheduled training classes, and participated in internet projects.

33.    Ms. Sarni pushed herself to continue working at Putnam for as long as possible;

however, she soon became unable to sustain the demands of even her accommodated,

sedentary position.

34.    Ms. Sarni ceased working at Putnam on March 3, 2003.

**Ms. Sarni's Claim for Disability Benefits**

35.    Following her last day of work at Putnam, Ms. Sarni timely filed an application for

short-term disability (STD) benefits.  The Hartford approved Ms. Sarni's claim for

STD benefits.

36.    Ms. Sarni received STD benefits for six months.

37.    At the end of the six month STD period, the Hartford approved Ms. Sarni's

September 3, 2003 claim for LTD benefits.

38.     On June 16, 2004, Ms. Sarni advised the Hartford that on April 10, 2004, the Social
        Security Administration had approved her claim for Social Security Disability
        Insurance Benefits effective September 2003.

39.     On September 5, 2005, the definition of Disability changed under policies GLT-
        204034, A083082035, and A083082036.  As of September 5, 2005, Ms. Sarni was
        eligible for LTD benefits if the Hartford determined that she was unable to perform
        "any substantial gainful employment for which you are reasonably qualified by
        education, training or experience".

40.     The Hartford continued to approve Ms. Sarni's LTD benefits despite this substantive
        change in the definition of Disability.

41.     On March 30, 2006, Dr. Susan Gauthier, D.O. completed an Attending Physician
        ("APS").  Dr. Gauthier certified Ms. Sarni's continued disability.  She noted that Ms.
        Sarni's symptoms included cognitive deficits, spasticity, imbalance, and chronic
        fatigue.  She also noted that Ms. Sarni suffered from ataxia in her lower extremities,
        spasticity and increased reflexes in her lower extremities, and difficulty walking.

42.     In May 2006, the Hartford reviewed Ms. Sarni's claim to determine whether she
        continued to meet the definition of Disability under the Plan.  The Hartford
        determined that Ms. Sarni remained disabled from any substantial gainful
        employment for which she is reasonably qualified by education, training, or
        experience

**The Hartford's Termination of Ms. Sarni's LTD Benefits**

43.     In April 2007, the Hartford requested updated information in support of Ms. Sarni's
        continued claim for LTD benefits.

44.     On May 15, 2007, Ms. Sarni submitted to the Hartford a completed Claimant's
Questionnaire in which she noted, in part, that her continued to be disabled from
Multiple Sclerosis, exaggerated startled response, fatigue, balance issues,
memory/cognitive problems, and mental fatigue.

45.     On June 5, 2007, one of Ms. Sarni's neurologists, a resident physician, Dr. Eman Ali,
completed an APS.  Dr. Ali noted that Ms. Sarni suffered from Multiple Sclerosis and
hyper startle syndrome.  She also listed Ms. Sarni's symptoms as balance and gait
problems and spasms.  Dr. Ali noted that Ms. Sarni's walking, standing, sitting, and
lifting/carrying was limited due to weakness in lower limbs and imbalance.  Dr. Ali
also noted that Ms. Sarni was moderately impaired in occupational functioning and
that she was limited in performing some occupational duties.

46.     The Hartford also reviewed medical records from Dr. Anton Pesok, Ms. Sarni's
treating psychiatrist, and a neuropsychological evaluation performed by Dr. Nancy
Madigan.

47.     On July 27, 2007, a nurse for the Hartford, Carol Pearson, conducted a CCM
Functional Assessment of Ms. Sarni's claim for LTD benefits.  The assessment
concluded that Ms. Sarni's "clinical presentation is consistent with some limitation of
ability to walk".  Ms. Pearson suggested that a neurologist and a psychiatrist review
Ms. Sarni's file in order to address both Ms. Sarni's cognitive and physical
functionality.

48.     On August 1, 2007, Marvin K. Bryan of the Hartford conducted an Employability
Analysis.  Mr. Bryant noted that the degree of Ms. Sarni's cognitive dysfunction
"could adversely impact ability to perform certain occupations that involve executive

functioning, memory processing, demanding multitasking".  Mr. Bryant also noted
that Ms. Sarni's ability to return to her previous employment is "questionable" and
that "at the most semi-skilled work with slight possibility for some entry level skilled
work in a well organized structured environment using compensation tools may be
possible, depending on the degree of deficits displayed in other cognitive areas,
transferability of skills and gainful".  Mr. Bryant concluded his review by suggesting
that "RCCM" needs "to review the entire neurpsych [sic] to be more vocationally
certain".

49.   On August 31, 2007, Dr. Pesok wrote to the Harford, in compliance with its request,
      stating that he had been treating Ms. Sarni for anxiety and depression and that these
      conditions could be significant at times.  Dr Pesok also noted that although Ms. Sarni
      did not have psychiatric contraindications to return to work, he suspected that her
      anxiety would worsen significantly if she had to return to work in a full time position
      without a transition.  Dr. Pesok did not state that Ms. Sarni could return to work or
      that she was not disabled due to her symptoms of Multiple Sclerosis.

50.   On September 17, 2007, Dr. Ali returned a signed letter to the Hartford.  The letter
      outlined the Hartford's assessment of Ms. Sarni's capability to perform full-time
      sedentary work that would involve mostly sitting with intermittent periods of
      standing/walking and occasional lifting of up to 10 pounds.  In signing this form, Dr.
      Ali indicated that she concurred with the Hartford's assessment of Ms. Sarni's
      capability.

51.   Based on Dr. Ali's September 17, 2007 letter and Dr. Pesok's August 31, 2007 letter,
      the Hartford determined that Ms. Sarni was capable of performing a full-time

sedentary occupation with the cognitive restrictions noted in Dr. Madigan's neuropsychological evaluation.

52.     On October 9, 2007, Mr. Bryant wrote an addendum to his August 1, 2007 Employability Analysis.  Mr. Bryant used a functional capacity of "full-time sedentary work" and formulated a list of occupations that he believed Ms. Sarni was capable of performing including Field Cashier, Supervisor - Production Clerk, Assignment Clerk, and Jacket Preparer.

53.     On October 4, 2007, the Hartford informed Ms. Sarni that it had terminated her LTD benefits under Policy GLT-204034 effective October 3, 2007.

54.     On October 18, 2007, the Hartford informed Ms. Sarni that it had terminated her LTD benefits under Policies A083082035 and A083082036 effective October 19, 2007.

55.     On November 9, 2007, counsel for Ms. Sarni wrote to the Hartford and requested a complete copy of Ms. Sarni's claim file including all documents pertaining to Policies GLT204034, A083082035, and A083082036.

56.     On November 26, 2007, the Hartford sent counsel for Ms. Sarni a copy of Ms. Sarni's claim file.

**Ms. Sarni's Appeal of the Hartford's Adverse Decision**

57.     On March 24, 2008, counsel for Ms. Sarni requested that the Hartford provide Ms. Sarni with thirty additional days from Ms. Sarni's April 1, 2008 appeal deadline, in which to submit documentation in support of Ms. Sarni's appeal.

58.     On March 31, 2008, the Hartford approved Ms. Sarni's request for an extension of thirty days.

59.     On April 18, 2008, counsel for Ms. Sarni submitted to the Hartford Ms. Sarni's appeal of the Hartford's decision to terminate her LTD benefits.

60.     As part of her April 18, 2008 appeal, Ms. Sarni provided the Hartford with the following documents supporting her entitlement to LTD benefits:

   1.     Ms. Sarni's sworn affidavit testimony;

   2.     Documentation regarding Multiple Sclerosis focusing on Ms. Sarni's most disabling symptoms – severe fatigue and cognitive dysfunction ;

   3.     Medical records from Partners Multiple Sclerosis Center;

   4.     Dr. Madigan's June 26, 2006 Neuropsychological Evaluation report;

   5.     Dr. Madigan's October 26, 2007 Neuropsychological Evaluation report;

   6.     Medical records from Ms. Sarni's former neurologist, Dr. Derek Smith;

   7.     Medical records from Ms. Sarni's psychiatrist, Dr. Anton Pesok;

   8.     Medical Records from Ms. Sarni's endocrinologist, Dr. Michael Gordon;

   9.     Medical records from Ms. Sarni's internist, Dr. Deborah Shih;

   10.    Medical records from Ms. Sarni's gastroenterologist, Dr. Michael DeMarkles;

   11.    Independent Vocational Evaluation report by James T. Parker, CRC, CCM;

   12.    Narrative Report from Ms. Sarni's treating neurologist, Dr. Eman Ali; and

   13.    Independent Medical Examination report by Neurologist Edward Wolpow, M.D., of Mt. Auburn Hospital.

61.     The independent vocational report dated April 8, 2008, and submitted to the Hartford as part of Ms. Sarni's appeal concluded that Ms. Sarni was "totally disabled from all employment".  Specifically, the vocational expert, Ms. Parker, concluded that Ms. Sarni's "inability to sustain concentration for extended periods of time with impaired

motor speed due to the effects of fatigue preclude Ms. Sarni's ability to complete

work tasks required by any employer in any occupation". Mr. Parker further noted

that "Ms. Sarni's inability to stand and walk without the possibility of falling impairs

her ability to perform in any unaccommodated sedentary occupation." and that Ms.

Sarni's "inability to sustain a normal workday and week due to fatigue and the need

to nap precludes Ms. Sarni from performing job duties essential to any occupation at

any exertional level".

62.     The narrative report authored by Dr. Ali dated March 10, 2008, and submitted to the

Hartford as part of Ms. Sarni's appeal addressed Dr. Ali's September 7, 2007

indication to the Hartford that Ms. Sarni was capable of full-time sedentary work. Dr.

Ali informed the Hartford that Ms. Sarni's neuropsychological reports – which were

not considered prior to her September 7, 2007 determination – "prove that she had

cognitive decline secondary to her primary disease including executive functions,

attention, visual planning and memory, and organization with additional slowing in

motor speed".

63.     Dr. Wolpow's independent medical examination report dated March 28, 2008, and

submitted by Ms. Sarni as part of her appeal, noted that Ms. Sarni's "most disabling

symptom … is fatigue … and expresses itself in her inability to carry out even simple

work at the computer for more than 10 minutes or so." Dr. Wolpow also noted, "[Ms.

Sarni] describes a variety of cognitive impairments including difficulty with memory

and difficulty concentration which are reflected in the worsening results of

neuropsychiatric testing carried out by Dr. Madigan over a period of years."

64.     Dr. Wolpow concluded in his report:

> In terms of any possibility of employment, I do not believe she is
> currently capable of sustaining full time sedentary employment.  I
> consider her at this point to be disabled for any gainful employment.  I
> am very much concerned that she is slowly worsening with time and, as I
> pointed out in my note to her physicians, I hope she is able to institute
> immunomodulatory therapy for multiple sclerosis soon.

65.     As part of her April 18, 2008 appeal, Ms. Sarni's counsel also identified the following

factors which she argued demonstrated the Hartford's abuse of its discretion in its

administration of Ms. Sarni's claim and termination Ms. Sarni's LTD benefits:

    1.      The Hartford ignored Ms. Sarni's self-reported symptoms;

    2.      The Hartford dismissed the opinions of Ms. Sarni's treating physicians;

    3.      The Hartford failed to conduct an independent medical examination;

    4.      The Hartford failed to investigate Ms. Sarni's fatigue and cognitive

        dysfunction and ignored the results from Ms. Sarni's neuropsychological

        testing;

    5.      The Hartford's "medical assessment" was conducted by a non-medical

        professional;

    6.      The Hartford erroneously equated the words "stable" and "under control" in

        Ms. Sarni's medical records to mean "improved"; and

    7.      The Hartford failed to demonstrate a change in Ms. Sarni's condition.

**The Hartford's Review of Ms. Sarni's Appeal**

66.     On April 25, 2008, the Hartford informed Ms. Sarni that it had received her appeal.

67.     On May 5, 2008, counsel for Ms. Sarni requested that the Hartford forward her a copy

of any medical or vocational reviews performed on Ms. Sarni's claim for benefits

subsequent to her April 18, 2008 appeal submission.  Counsel informed the Hartford

that providing these reviews to Ms. Sarni prior to making a determination on her

claim will help to ensure that the Hartford provides Ms. Sarni with a full and fair
review of her claim for benefits.

68.     On June 5, 2008, the Hartford informed counsel for Ms. Sarni that it had referred Ms.
Sarni's file for "medical reviews by two independent physicians".  The Hartford
requested that counsel for Ms. Sarni contact each of Ms. Sarni's providers and "urge
them to fully cooperate in speaking with the independent physicians when called".  In
addition, the Hartford requested Dr. Madigan's contact information.

69.     On June 9, 2008, counsel for Ms. Sarni provided the Hartford with Dr. Madigan's
address, fax number, and phone number.   Counsel for Ms. Sarni reiterated her
request that the Hartford provide Ms. Sarni's physicians with the opportunity to
review and respond to the Hartford's medical reviews.

70.     On June 12, 2008, declined counsel for Ms. Sarni's request that the Hartford provide
Ms. Sarni's physicians with the opportunity to review and respond to the Hartford's
medical reviews of Ms. Sarni's claim.

71.     On July 3, 2008, counsel for Ms. Sarni wrote a letter to the Hartford informing it of
the substantive and legal bases for her request for the Hartford's peer review reports
prior to the Hartford's final decision.  In her letter, counsel for Ms. Sarni requested
that the Hartford reconsider its position regarding the disclosure of its peer review
reports.  Counsel for Ms. Sarni reminded the Hartford that allowing Ms. Sarni's
physicians to respond to any inaccuracies contained in the Hartford's reports only
serves to further the goal of determining whether Ms. Sarni is disabled.

**The Hartford's Decision to Uphold its Termination of Ms. Sarni's LTD Benefits**

72.    On July 22, 2008, the Hartford upheld its decision to terminate Ms Sarni's LTD benefits.

73.    In upholding its decision to terminate Ms. Sarni's LTD benefits, the Hartford relied on file reviews conducted by Drs. Randall King and Jacquelyn Olander.

74.    Dr. King is a consulting neurologist for University Disability Consortium.

75.    Dr. Olander is a consulting neuropsychologist for University Disability Consortium.

76.    The Hartford paid University Disability Consortium a total of $2,610.00 for the file reviews conducted by Drs. King and Olander.

77.    On June 26, 2008, Dr. Olander wrote to Dr. Nancy Madigan, Ms. Sarni's neuropsychologist, and requested that Dr. Madigan respond to five questions regarding the neuropsychological testing that Dr. Madigan conducted on October 26, 2007.  Dr. Olander provided Dr. Madigan with five business days to respond to her letter.

78.    On July 2, 2008, four business days following her letter to Dr. Madigan, Dr. Olander wrote a report and raised five concerns regarding Dr. Madigan's neuropsychological testing.  Despite failing to wait five business days for Dr. Madigan's response, Dr. Olander concluded that there was insufficient evidence to support Dr. Madigan's conclusion that Ms. Sarni was unable to work from a cognitive and/or psychological perspective.

79.    At no point did Dr. Olander attempt to follow up with Dr. Madigan in order to obtain her response to Dr. Olander's five questions.

80.   At no point did the Hartford attempt to follow up with Dr. Madigan in order to obtain her response to Dr. Olander's five questions.

81.   At no time subsequent to Dr. Olander's June 26, 2008 correspondence to Dr. Madigan did Dr. Olander or the Hartford inform counsel for Ms. Sarni or Ms. Sarni that Dr. Olander was having difficulty contacting Dr. Madigan.

82.   On July 25, 2008, counsel for Ms. Sarni requested a complete copy of Ms. Sarni's claim file for Policies GLT-204034, A083082035, and A083082036.

83.   On August 8, 2008, the Hartford submitted to counsel for Ms. Sarni a copy of Ms. Sarni's claim file.

84.   On October 16, 2008, counsel for Ms. Sarni wrote to the Hartford and asked it to address a July 25, 2008 letter from Dr. Madigan which provided a detailed response to each of Dr. Olander's five questions.  Counsel for Ms. Sarni provided the Hartford with confirmation of the fax cover sheet evidencing Dr. Olander's receipt of Dr. Madigan's letter just three days after the Hartford's December 22, 2008 letter upholding its termination of Ms. Sarni's LTD benefits.  Counsel for Ms. Sarni listed the following reasons why the Hartford should consider Dr. Madigan's July 25, 2008 letter:

   1.   Dr. Olander's submission of her report without providing Dr. Madigan sufficient time to respond to her questions was unreasonable, particularly since Dr. Olander failed to contact Dr. Madigan to determine whether, and when, Dr. Madigan intended to respond to her questions before rendering her report;

2. The Hartford, and not Ms. Sarni or her counsel, was the party who solicited Dr. Madigan's opinion regarding the neuropsychological testing; it should have taken the time to wait for or follow up with Dr. Madigan; and

3. Dr. Madigan's response to Dr. Olander's questions indicates that Dr. Olander took significant liberties in interpreting the results of Dr. Madigan's neuropsychological testing. Whenever Dr. Olander posed a question regarding Ms. Sarni's performance on the testing, she immediately interpreted the results against Ms. Sarni and in favor of a finding that supported the Hartford's termination of her LTD benefits.

85. On October 27, 2008, the Hartford informed counsel for Ms. Sarni that it refused to consider Dr. Madigan's July 25, 2008 response "this documentation was received subsequent to our appeal determination of Ms. Sarni's claim".

86. On November 7, 2008, counsel for Ms. Sarni wrote a letter to the Hartford informing it that its failure to consider Dr. Madigan's response to Dr. Olander's concerns regarding Dr. Madigan's neuropsychological testing demonstrated a breach of its fiduciary duty to Ms. Sarni. Counsel for Ms. Sarni informed the Hartford of the substantive and legal reasons why Dr. Madigan's July 25, 2008 letter should have been considered by the Hartford.

87. The Hartford did not respond to counsel for Ms. Sarni's November 7, 2008 letter.

## Summary of the Hartford's Administration of Ms. Sarni's Claim for LTD Benefits

88. Ms. Sarni remains totally disabled from any occupation as a result of her Multiple Sclerosis.

89. Ms. Sarni has exhausted her administrative remedies pursuant to 29 C.F.R. 2560.503-

1(1).

90.   The Defendants and their medical reviewers arbitrarily dismissed Ms. Sarni's self-reported symptoms when they determined that Ms. Sarni was not disabled.

91.   The Defendants failed to assess Ms. Sarni's functional capacity to engage in duties of any substantial gainful employment for which she is reasonably qualified by education, training or experience

92.   The Defendants failed to address or analyze the findings of Ms. Sarni's treating physicians' opinions regarding Ms. Sarni's symptoms, restrictions, limitations and disability.

93.   The Defendants failed to address or analyze the findings of an independent vocational expert and an independent neurologist who found Ms. Sarni to be totally disabled from any occupation.

94.   Ms. Sarni's total disability is based on the substantial evidence in the Defendants' possession.

95.   The Defendants failed to provide Ms. Sarni with a full and fair review of her claim for disability benefits.

96.   The Defendants' decision to deny Ms. Sarni's benefits was wrongful, unreasonable, irrational, solely contrary to the evidence, contrary to the terms of the Plan and contrary to law.

97.   The Defendants were influenced by their financial conflict of interest when they denied Ms. Sarni's benefits.

98.   Any discretion to which Defendants may claim they are entitled under the Plan is negated by their failure to provide Ms. Sarni with an explanation as to their adverse

action and to provide her with a full and fair review of her claim for benefits.

99.     The self-serving nature of the Defendants' decision that Ms. Sarni is no longer

disabled is illuminated by the fact that Ms. Sarni's condition has not changed since

the Defendants first accepted liability on her claim for benefits, but rather has

worsened.

100.    Remand is inappropriate in this matter as the Defendants had sufficient time to

conduct a full and fair review of Ms. Sarni's claim and has failed to do so.

101.    Due to the unlawful denial of benefits under ERISA, Ms. Sarni has lost her rightful

disability benefits.  Ms. Sarni has also lost her rightful health insurance benefits

through her employer, receipt of which is contingent on Ms. Sarni's receipt of LTD

benefits.  Ms. Sarni has also suffered emotional distress and humiliation as a result of

the Defendants' actions.

102.    Due to the unlawful denial of benefits under ERISA, Ms. Sarni has also lost the use of

her disability benefits.

103.    Having exhausted the administrative procedures provided by the Defendants, Ms.

Sarni now brings this action.

## FIRST CAUSE OF ACTION
### (Enforcement of Terms of Plan
### Action for Unpaid Benefits and Employee Benefits)
### (ALL DEFENDANTS)

104.    Ms. Sarni realleges each of the paragraphs above as if fully set forth herein.

105.    The Plan is a contract.

106.    Ms. Sarni has performed all of her obligations under the contract.

107.    29 U.S.C. § 1132(a)(1)(B) states that:

A civil action may be brought ---

1.      by a participant or beneficiary –

      1.      for the relief provided for in subsection (c) of this section, or

      2.      to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan.

108.   The Defendants' actions constitute an unlawful denial of benefits under ERISA, as provided in 29 U.S.C. § 1132(a)(1)(B).

109.   The Defendants unlawfully terminated Ms. Sarni's benefits in part by: (1) dismissing without explanation, the substantial evidence supporting Ms. Sarni's claim for LTD benefits; and (2) denying Ms. Sarni a full and fair review of their decision to deny her benefits.

110.   In accordance with 29 U.S.C. §1132, Ms. Sarni is entitled to LTD benefits under the Plan based upon her disabled status from any occupation from and after October 3, 2007, and continuing into the present.

111.   Ms. Sarni is also entitled to have her employee benefits, including her health insurance benefits, reinstated by MMC.

112.   The Defendants have refused to provide Ms. Sarni with these benefits and are, therefore, in breach of the terms of the Plan and ERISA, which requires that the Defendants engage in a full and fair review of all claims and the administration of the Plan in the best interests of the Plan participants.

113.   As a direct and proximate result of this breach, Ms. Sarni has lost the principal and the use of her rightful disability benefits.

114.    As a direct and proximate result of this breach, Ms. Sarni has also lost her health

        insurance benefits.

## SECOND CAUSE OF ACTION
### (Attorneys' Fees and Costs)
### (ALL DEFENDANTS)

115.    Ms. Sarni realleges each of the paragraphs above as if fully set forth herein.

116.    Under the standards applicable to ERISA, Ms. Sarni deserves to recover "a

        reasonable attorney's fee and costs of the action" herein, pursuant to section

        502(g)(1) of ERISA, 29 U.S.C. § 1132(g).

117.    The Defendants have the ability to satisfy the award.

118.    Ms. Sarni's conduct of this action is in the interests of all participants suffering from

        physical conditions who subscribe to the Plan, and the relief granted hereunder will

        benefit all such participants.

119.    The Defendants have acted in bad faith in denying Ms. Sarni's disability benefits

        under the Plan.

120.    The award of attorneys' fees against the Defendants will deter others acting under

        similar circumstances.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiff respectfully prays that the Court:

(1)    Declare, adjudge and decree that Ms. Sarni is entitled to retroactive and ongoing

       disability benefits as calculated under the terms of the Plan.

(2)    Award Ms. Sarni disability benefits and interest from the dates of the Defendants'

       breaches of contract.

(3)      Order that the Defendants reinstate Ms. Sarni's health insurance benefits and

make restitution to Ms. Sarni in the amount of all medical expenses she has

sustained since the Defendants' termination of her LTD benefits.

(4)      Order that the Defendants make restitution to Ms. Sarni in the amount of all

losses sustained by Ms. Sarni as a result of the wrongful conduct alleged herein,

together with prejudgment interest.

(5)      Award Ms. Sarni the costs of this action and reasonable attorneys' fees;

and

(5)      Award such other relief as the court deems just and reasonable.


                              Respectfully submitted for the Plaintiff,


                    By:      /s/ Alyssa A. Yenikomshian
Date:  February 13, 2009     Alyssa A. Yenikomshian
                             BBO No. 669688
                             Mala M. Rafik
                             BBO No. 638075
                             ROSENFELD & RAFIK, P.C.
                             44 School Street, Suite 350
                             Boston, MA 02108
                             T: 617-723-7470
                             F: 617-227-2843
                             E: aay@rosenfeld.com